UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBYN BORGESI, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 06-4244 |
| v. | : | MEMORANDUM OPINION & ORDER |
| QUEST DIAGNOSTICS, INC., et al., | : | |
| Defendants. | : | |

This matter has come before the Court on motion of Defendants Quest Diagnostics, Inc., Allison Malcolm, and Cassandra Moore, for summary judgment pursuant to Fed. R. Civ. P. 56 [Document 11]. The Court has considered the submissions of the Defendants, and Plaintiff's opposition to the motion, and heard oral argument on the record on May 20, 2008. For the reasons set forth here, and on the record during oral argument, the Defendants' motion is granted.

**Factual Background**

On August 2, 2006, Plaintiff Robyn Borgesi filed a Complaint in the Superior Court of New Jersey, Law Division, Camden County, against her former employer Quest Diagnostics, Inc. Plaintiff began employment with Quest as a temp in August 2000, and she was hired as a permanent at-will employee in August 2002. Plaintiff worked as a phlebotomist in Quest's Mount Holly and then Voorhees Patient Service Centers. She alleges that she was under a doctor's care on May 17, 2006, and was granted disability leave of absence from May 18, 2006 through August 16, 2006. On May 18, 2006, however, Quest cancelled Plaintiff's health insurance benefits as part of its termination of Plaintiff due to an alleged altercation with a co-worker coupled with a patient complaint while on final corrective action. Plaintiff denies those charges against her.

Also named as Defendants are Allison Malcolm, Plaintiff's former supervisor,[1] and Cassandra Moore, Plaintiff's former group leader.  Both are African-American, while Plaintiff is Caucasian.  Plaintiff alleges that she had been harassed at her place of employment due to her race, as every other employee but one in her department was African American.[2]  She claims that she was terminated due to her race in violation of the NJLAD, N.J. Stat. Ann. § 10:5-1.  Plaintiff also claims breach of the covenants of good faith and fair dealing because she was not given fair warning of any employment problems before her employment was terminated.  Finally, Plaintiff contends that the Defendants violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 because she was approved for medical leave due to a serious health condition which rendered her unable to perform necessary job functions, yet she was terminated and denied health insurance coverage.

The matter was removed to this Court by the Defendants, who have now filed a motion for summary judgment attacking the substance of the Complaint.  In contrast to Plaintiff's contentions, Defendants have asserted that in or about February of 2005, Quest provided Plaintiff with a disability leave of absence that it also "marked" as a leave

---

[1] Malcolm oversees eight Patient Service Centers in Camden and Gloucester Counties, (Frattarelli Cert., Ex. 4, at 7:23-8:16), and reports to Kim George, a patient services manager who is white, (Frattarelli Cert., Ex. 10, at 6:3-6; Ex. 4, at 21:19-21).

[2] Quest contends it employed at least eight white employees, in addition to Plaintiff, who worked at the Voorhees PSC over the course of Plaintiff's employment at that location: Michelle Jensen, Angel Bebe, Linda Hart, Jeanine Redman, Janet Coleman, Carol Sullivan, Dean DelFico, and a Teresa, (Frattarelli Cert., Ex. 4, at 132:19-133:1,149:12-17; Ex. 6, at 19:14-22; Ex. 13, at 10:6-14), and in approximately 2005 and 2006, the Voorhees PSC had a permanent staff of six employees, three of whom were white: Plaintiff, Jeanine Redman, and Michelle Jensen, (Frattarelli Cert., Ex. 16, at 5:8-12, 6:3-11, 7:10-21).

of absence under the FMLA. (Frattarelli Cert., Ex. 1, at ¶ 5.) Also in or about early 2005, Quest promoted Plaintiff to senior phlebotomist. (Frattarelli Cert., Ex. 1, at ¶ 6; Ex. 2, at 160:7-161:10.) Malcolm is the one who recommended Plaintiff for the promotion. (Frattarelli Cert., Ex. 2, at 161:6-8.) There had been at least three African-American employees that Quest had also considered for the promotion to the senior phlebotomist position, but Quest promoted Plaintiff. (Frattarelli Cert., Ex. 1, at ¶ 7.) In addition, from approximately May 23, 2005 through July 18, 2005, Quest provided Plaintiff with another FMLA leave of absence. (Frattarelli Cert., Ex. 1, at ¶ 8.)

On or about November 4, 2005, Quest issued Plaintiff a verbal warning for allegedly calling a co-worker a "bitch." (Frattarelli Cert., Ex. 4, at 21:6-22; Ex. 7.) Plaintiff's recollection is that she said the co-worker was "acting like a bitch." (Frattarelli Cert., Ex. 2, p. 171.) Also in or about November 2005, Quest received a written complaint from Plaintiff's co-worker, Caprisha Taylor, in which Taylor complained that Plaintiff "had an argument or dispute with just about everyone in the site because of the way that she speaks to people." (Frattarelli Cert., Ex. 4, at 57:23-58:14; Ex. 8.)

At about that time, Plaintiff told Malcolm that the Voorhees PSC was "out of control" and asked for Kim George to come to the Voorhees Patient Service Center. (Frattarelli Cert., Ex. 2, at 74:19-75:19;172:17-173:1.) In early 2006, George went to the Voorhees Center and held a meeting with the staff regarding proper behavior in the office with respect to cell phones, breaks, and personal calls, and she let the staff know "about everything that [Plaintiff] complained about." (Frattarelli Cert., Ex. 2, at 173:16-174:5; Ex. 9, at 207:3-20.) Malcolm advised George that she had received complaints

3

from Plaintiff's co-workers regarding Plaintiff's attitude and behavior, and that she had also received complaints from patients regarding Plaintiff. (Frattarelli Cert., Ex. 10, at 11:4-12:5; 18:20-21.)

The record reflects that both white and black employees complained about Plaintiff to the group leader, Cassandra Moore, and/or Malcolm. (Frattarelli Cert., Ex. 2, at 167:17-169:8 (complaint by Linda Hart, white); Ex. 4, at 57:23-58:14 (complaint by Caprisha Taylor, black); 61:14-17 (complaint by Angel Bebe, white); 144:24-145:7 (complaint by Michelle Jensen, white)).  For example, Linda Hart complained about Plaintiff "picking on her" and "bullying" her, telling an elderly man to "get lost," and complaining about Plaintiff commenting in the office that "it was so cold that her nipples could cut glass." (Frattarelli Cert., Ex. 6, at 5:11-6:6; 16:8-21; 21:7-23.)  Caprisha Taylor complained about Plaintiff arguing with "just about everyone in the site because of the way that she speaks to people." (Frattarelli Cert., Ex. 8.)  Angel Bebe complained about Plaintiff making fun of her religion, and Michelle Jensen complained about Plaintiff being very embarrassing. (Frattarelli Cert., Ex. 4, at 61:14-17; 144:24-145:7.)  At least one white employee, Linda Hart, transferred from the Voorhees PSC because of Plaintiff.  (Frattarelli Cert., Ex. 6, at 5:11-15.)

Ms. George discussed the complaints regarding Plaintiff with Senior Human Resources Generalist Lisa Davis and eventually recommended to Malcolm that she demote Plaintiff. (Frattarelli Cert., Ex. 10, at 15:24-16:7.)  Malcolm, however, asked George if she could "have the opportunity to work with [Plaintiff]" instead and George agreed. (Frattarelli Cert., Ex. 10, at 16:1-7, 17:21-18:8.)  On or about April 24, 2006, however, Quest issued Plaintiff a final written warning for "calling out" from work more

4

than three times within a ninety-day period in violation of Quest's attendance policy.[3] (Frattarelli Cert., Ex. 11.)

On May 17, 2006, Plaintiff engaged in a verbal altercation with another co-worker, Diana Stratton, who is African-American. (Frattarelli Cert., Ex. 2, at 215:1-5.) Plaintiff claims that Diana Stratton told Malcolm that Plaintiff was "MIA" for over an hour. (Frattarelli Cert., Ex. 2, at 215:24-216:6.) Plaintiff claims that she thereafter confronted Stratton about the allegation she made and asked her why she said that Plaintiff was missing for one hour when Stratton knew that she was not. (Frattarelli Cert., Ex. 2, at 217:7-18.) Plaintiff also noted that this conversation occurred in the hallway directly adjacent to the patient waiting room. (Frattarelli Cert., Ex. 2, at 217:20 and 226:4-5.) At the time of the altercation, Plaintiff had an existing final written warning while Stratton had an existing verbal warning. (Frattarelli Cert., Ex. 4, at 30:12-19.)

Following the altercation, still on May 17, 2006, George received a telephone call from Malcolm who advised her that Plaintiff and Stratton had engaged in an altercation in front of patients in which profanity was used and during which other employees had to pull Plaintiff and Stratton apart, and that both employees had admitted to having an altercation in front of patients and co-workers. (Frattarelli Cert., Ex. 10, at 28:15-29:16.) Quest has a "Zero Tolerance Policy" that prohibits fighting in the workplace. (Frattarelli

---

[3]Quest has a no-fault attendance policy that provides for corrective action if an employee is absent three times during a ninety-day period. Because Plaintiff already had a verbal warning, and then had been absent more than three times during a ninety-day period, she received a final written warning. (Frattarelli Cert., Ex. 10, at 64:13-65:4; Ex. 14.)

Cert., Ex. 15.) Also on May 17, 2006, George learned from Malcolm that Plaintiff was already on a final written warning; George told Malcolm that the altercation would therefore lead to "possible termination" for Plaintiff and that she would discuss it with Lisa Davis. (Id.)

On May 17, 2006, George did discuss the altercation with Davis and recommended to Davis that Quest terminate Plaintiff's employment. (Frattarelli Cert., Ex. 10, at 30:22-31:9.) Davis concurred with George's recommendation and made the decision to terminate Plaintiff's employment on May 17, 2006. (Frattarelli Cert., Ex. 10, at 32:12-16.) Davis testified that she decided to terminate Plaintiff's employment because Plaintiff had engaged in the altercation described by Malcolm while already on a final written warning. (Frattarelli Cert., Ex. 12, at 52:25-53:11.) Neither Malcolm nor Moore made the decision to terminate Plaintiff's employment. The decision was made by Lisa Davis upon George's recommendation. (Frattarelli Cert., Ex. 12, at 39:8-11; Ex. 10, at 30:22-31:9.) Again, both Davis and George are Caucasian.

Late in the evening of May 17, 2006, Plaintiff called Quest's Benefits Solutions Center to request a short term disability leave. Quest's Benefits Solutions Center -- which is not located in Voorhees – is responsible for employee leave issues and receives and processes requests for short term disability leave from employees. (Frattarelli Cert., Ex. 2, at 230; 7-231:10.) Ms. George did not learn of Plaintiff's request for short term disability leave until the following day, May 18, 2006. (Frattarelli Cert., Ex. 10, at 71:12-72:4.) George advised Davis that Plaintiff had requested a short term disability leave. (Frattarelli Cert., Ex. 10, at 72:5-14.) Davis, in turn, contacted Quest's Benefit Solutions Center to determine whether or not she could still proceed with the termination if

6

Plaintiff was on a short term disability leave.  (Frattarelli Cert., Ex. 10, at 24:21-25:13.)  Tom Pela, who is the manager of Quest's Benefits Solutions Center, advised Davis that she could still proceed with the termination and Davis so advised George.  (Frattarelli Cert., Ex. 12, at 25:4-20.)   George then advised Malcolm that she could proceed with the termination of Plaintiff's employment and that it would not affect Plaintiff's short term disability benefits.  (Frattarelli Cert., Ex. 4, at 39:14-24.)

On May 19, 2006, Malcolm advised Plaintiff by phone that her employment had been terminated.  (Frattarelli Cert., Ex. 2, at 234:15-21.)  Plaintiff did receive short term disability benefits in connection with her request for disability leave.  (Frattarelli Cert., Ex. 2, at 238:21-23.)  No one replaced Plaintiff following her termination.  (Frattarelli Cert., Ex. 13, at 9:24-10:1.)  Plaintiff did not look for any other employment after Quest terminated her employment, citing her "embarrassment" over the fact that she had been terminated from employment.  (Frattarelli Cert., Ex. 2, at 249:6-7; 250:11-14.)

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

### Reverse Employment Discrimination

Analysis of claims made pursuant to the NJLAD generally follows the analysis of Title VII claims.  <u>Schurr v. Resorts Int'l Hotel, Inc.</u>, 196 F.3d 486, 498 (3d Cir. 1999).  It is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose.  <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 525-27 (3d Cir. 1992).

Such analysis is governed by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under <u>McDonnell Douglas</u>, an employee must first establish by a preponderance of the evidence a prima facie claim of discrimination by showing  (1) the plaintiff is a member of a protected class; (2) he or she was qualified for the position sought; (3) he or she was subject to an adverse employment action despite being qualified; and (4) the employer treated more favorably those not in the protected class or, under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to plaintiff's to fill the position.

Sarullo v. United States Postal Service, 352 F.3d 789, 797 (3d Cir. 2003) (citations omitted).  The prima facie test is a flexible one which must be tailored to fit the specific context in which it is applied.  Id. at 797-98.  For instance, the analysis is somewhat modified in the context of reverse discrimination, in that the plaintiff must present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others under similar circumstances, based upon a trait that is protected under Title VII.  See Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999); Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("The central focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of" their race, religion, gender, age, etc.).

      Similarly, under the NJLAD, the plaintiff has a modified burden under the first prong of the McDonnell Douglas test to show "background circumstances supporting the suspicion that defendant is the unusual employer who discriminates against the majority."  Erickson v. Marsh & McLennan Co., Inc., 569 A.2d 793, 799 (N.J. 1990) (quoting Livingston v. Roadway Express, 802 F.2d 1250, 1252 (10th Cir.1986) (other citations omitted)).  To show background circumstances sufficient to warrant an inference of discrimination, an employee can either (1) establish that she was better qualified for the position than the minority candidate selected, or (2) establish that the employer had some "reason or inclination to discriminate against the majority class." Bergen Comm'l Bank v. Sisler, 723 A.2d 944, 957 (N.J. 1999) (citing Murphy v. Milwaukee Area Technical Coll., 976 F. Supp. 1212, 1217 (E.D.Wis.1997)).

      Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment

decision.  McDonnell Douglas, 411 U.S. at 802.  The employer may satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  However, "[a]n employer cannot successfully defend a hiring decision against a Title VII challenge merely by asserting that the responsible hiring official selected the man or woman who was 'the right person for the job.'" Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999).

Once the employer meets this "relatively light burden," "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." Fuentes, 32 F.3d at 763.  To defeat a motion for summary judgment, a plaintiff can show pretext by "point[ing] to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons[4]; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Iadimarco, 190 F.3d at 166 (quoting Fuentes, 32 F.3d at 764).  One of these is sufficient; the employee does not have to prove both that the explanation is implausible *and* that discrimination was a motivating factor.  Waldron v. SL Indus.,

---

[4]Where the plaintiff offers evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail." Iadimarco, 190 F.3d at 166.  Thus, if a plaintiff produces credible evidence that it is more likely than not that the employer did not act for its proffered reason, the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent.  Ezold, 983 F.2d at 524.

Inc., 56 F.3d 491, 494-95 (3d Cir. 1995).  On the other hand, the employee cannot carry her burden by showing that the employer's decision was "wrong or mistaken." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Rather, she must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder *could* rationally find them unworthy of credence," id. (citing Ezold, 983 F.2d at 531), "and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons,'" id. (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

In this case, there simply is no record evidence that Defendant Quest is the unusual employer who discriminates against the Caucasian majority.  The decision-makers in this case were Caucasian, and Plaintiff's counsel has acknowledged that there were no racial comments made at any time; at oral argument, he could point to nothing in the record that even tended to implicate race as a factor in Plaintiff's termination.  Accordingly, Plaintiff cannot establish a prima facie case of reverse racial discrimination under the NJLAD.  Even if the Court were to assume a prima facie case for purposes of the instant motion, there also is no record evidence that would tend to establish that Quest's reason for Plaintiff's termination was pretextual.  Quest has produced a paper trail for its employment decision indicating that while subject to a "final written warning," Plaintiff initiated an argument and possibly an altercation with a co-worker in front of patients.

**Hostile Work Environment**

Again, analysis of claims made pursuant to the NJLAD generally follows the analysis of Title VII claims. Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999). Similar to the Title VII standard, in order to state a hostile work environment claim under NJLAD, a plaintiff must establish four elements: the complained-of conduct (1) would not have occurred but for the employee's protected status; and it was (2) severe or pervasive enough to make a (3) reasonable employee believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. Entrot v. BASF Corp., 819 A.2d 447, 452 (N.J. Super. Ct. App. Div. 2003) (quoting Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 453 (N.J. 1993)) (quotations omitted). A viable hostile environment claim stems from extremely insensitive conduct against the protected person so egregious that it alters the conditions of employment and destroys the person's equal opportunity in the workplace. See DeAngelis v. El Paso Municipal Police Officers Ass'n, 51 F.3d 591 (5th Cir.), cert. denied 516 U.S. 974 (1995).

Specifically with regard to hostile work environment claims, the New Jersey Supreme Court adopted the "severe or pervasive" test as part of its comprehensive standard, which "conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law." Taylor v. Metzger, 706 A.2d 685, 689 (N.J. 1998) (citations omitted). That is, in order for harassment to be cognizable, it must be "'sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" West, 45 F3d at 753 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

13

A court must look at the totality of the circumstances and consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Thus, plaintiffs must realize that "not everything that makes an employee unhappy" qualifies as actionable discrimination or retaliation. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997) (citations omitted).

There is no authenticated record evidence to show that Plaintiff was subjected to a hostile work environment while still employed by Quest. At oral argument, Plaintiff's counsel revealed that the hostile work environment claim is premised on the Plaintiff's belief that Allison Malcolm and Cassandra Moore, African Americans, did not listen to Plaintiff's complaints about the staff and did not support Plaintiff in the disagreement that arose on May 17, 2006 between Plaintiff and Stratton, also African American, regarding whether Plaintiff had taken an hour for lunch. There is no evidence from which one could infer that Plaintiff was treated badly because of her race, and the unpleasantries Plaintiff has described hardly rise to the level of severe or pervasive conduct that would have altered Plaintiff's employment conditions.

### Breach of Covenant of Good Faith and Fair Dealing

Plaintiff was an at-will employee. "In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." Noye v. Hoffmann-La Roche Inc., 570 A.2d 12, 14 (N.J. Super. Ct. App. Div. 1990) (citing McQuitty v. General Dynamics Corp., 499 *A*.2d 526 (N.J. Super. Ct. App. Div. 1985); Brunner v. Abex Corp.,

14

661 F. Supp. 1351, 1356 (D.N.J. 1986)).  While an implied obligation of good faith may be applicable to those aspects of the employer-employee relationship which are governed by some contractual terms, see <u>Fregara v. Jet Aviation Business Jets</u>, 764 F. Supp. 940, 954 (D.N.J. 1991) (citing <u>Nolan v. Control Data Corp.</u>, 579 A.2d 1252, 1257 (N.J. Super. Ct. App. Div. 1990)), Plaintiff has pointed to no such aspect in the employment relationship she had with Quest that would allow her to recover for the tort of breach of good faith and fair dealing in this case.  Moreover, Plaintiff's termination should not have been a surprise to her.  Quest's reasons are documented on the record, and followed the employer's progression of disciplinary steps.  Accordingly, summary judgment will be granted on this count of the Complaint.

**FMLA**

The purposes of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1) and (2).  To those ends, the FMLA requires that "an eligible employee shall be entitled to a total of twelve workweeks of leave during any twelve month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

"To trigger the application of the FMLA, an employee must provide his employer with notice that leave is necessary."  <u>Johnson v. Thru Point, Inc.</u>, 160 Fed. Appx. 159, 162 (3d Cir. 2005)  (citing 29 C.F.R. § 825.303 and holding that the plaintiff had not put

his employer on notice of his need for health-related leave because he neither advised his employer of a medical condition nor provided the employer with an opportunity to discover it). The Code of Federal Regulations states that:

> [a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only that leave is needed for an expected birth or adoption, for example.

29 C.F.R. § 825.302(c) (2006). Therefore, "[t]o trigger the rights guaranteed under the FMLA, an employee need not actually mention the FMLA by name, "the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." Holpp v. Integrated Commc'ns Corp., Civ. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J. December 20, 2005) (quoting Brohm v. JH Props., 149 F.3d 517, 523 (6th Cir. 1998)) (emphasis added). Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c) (2006).

The FMLA further provides:

> [i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(2) (1993). On the other hand, if an employee is discharged during a protected leave for a reason unrelated to the leave, there is no right to reinstatement. Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004) (citing 29

16

C.F.R. § 825.216(a)(1)).  See also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).

To establish a prima facie claim of retaliation for requesting FMLA leave, a plaintiff must show that: (1) she engaged in protected activity (taking FMLA leave); (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to the leave.  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004).  In this case, Plaintiff requested leave soon after Quest determined that she would be terminated.  Despite her invoking such leave, she was fired.  Regarding the prima facie case, then, the issue to be decided is whether the summary judgment record reflects a material dispute of fact as to whether there was a causal connection between the two.  The Court finds it does not.

To be sure, there was temporal proximity between the leave request and the termination.  It is clear from the record, however, that Quest was contemplating Plaintiff's termination before its representatives learned of Plaintiff's call to Quest's Benefits Solutions Center regarding medical leave.  (Frattarelli Cert., Ex. 10, at pp. 32, 71.)  Quest was correct in its assessment that it was not required to suspend its termination proceedings just because the employee requested medical leave.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).

The record reflects that Plaintiff knew that, as of April 24, 2006 and for at least a year from that date, she was operating under a final written warning due, at least in part, to her absences which were deemed excessive according to Quest's no-fault attendance

policy.  That is, Plaintiff was absent three times in a four-week period.[5]  The record also reflects that, while subject to the final written warning, Plaintiff initiated an argument with a co-worker in front of patients, in violation of the employer's zero-tolerance policy.  Her attempt to invoke the FMLA after her May 17, 2006 actions, therefore, even assuming that the FMLA is legitimately implicated, cannot prevent her employer from proceeding with her termination.  "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" Windfelder v. The May Dep't Stores Co., 93 Fed. Appx. 351, 355 (3d Cir. 2004).

Accordingly, the Court finds that Plaintiff has failed to produce evidence of a causal link between her protected activity and her termination sufficient to establish a prima facie case of retaliation.  Moreover, she is unable to rebut the legitimate reasons documented and given by Quest that explain its principals' decision to terminate her.

## The Individual Defendants

Finally, no evidence has been put forth to show that Allison Malcolm or Cassandra Moore harassed Plaintiff or racially discriminated against her.  There also is no evidence that these individuals had any decision-making authority with regard to Plaintiff's employment or leave.  Plaintiff's complaint against these two is that she does not believe they handled fairly the things she discussed with them regarding co-workers:

---

[5]It appears that Plaintiff now argues that her absences should have been excused in the spirit of the FMLA because she possessed doctors' notes corresponding to each instance.  There is no evidence, however, that Plaintiff furnished those medical excuses to her employer at the time, or that all of her absences were related to a serious health condition as required by the statute.

the co-workers' use of cell phones in front of patients, various arguments, that the co-workers lied about Plaintiff and seemed to act as a clique.  (See Frattarelli Cert., Ex. 1, at pp. 82-84.)  The record falls short, however, of converting Plaintiff's beliefs into any viable claim against these two.  As such, summary judgment will be granted in their favor.

## Conclusion

For these reasons, and in keeping with the discussion held on the record of May 21, 2008,

**IT IS ORDERED** on this 26th day of June, 2008 that the motion of Defendants Quest Diagnostics, Inc., Allison Malcolm, and Cassandra Moore for summary judgment pursuant to Fed. R. Civ. P. 56 **[11]** is hereby **GRANTED**.

      /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.